IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

ZARIA WILLIS

    Plaintiff,

v.

NEWREST ATL LLC

    Defendants.

Civil Action No.

JURY TRIAL DEMANDED

## COMPLAINT FOR DAMAGES

COMES NOW, ZARIA WILLIA ("Plaintiff" or "Ms. Willis"), and files this Complaint against Defendants NEWREST ATL, LLC ("Defendants"), and shows the following:

## I.    NATURE OF COMPLAINT

1.

Plaintiff brings this action for damages, liquidated damages, and reasonable attorney fees for Defendants' violation of her rights under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e ("Title VII").

## II.    <u>ADMINISTRATIVE PROCEDURES</u>

2.

Plaintiff has fulfilled all conditions necessary to proceed with this cause of action under Title VII.  Plaintiff filed her Charge of Discrimination with the EEOC on September 12, 2023.

3.

The EEOC issued the "Notice of Right to Sue" on each Charge on March 28, 2024, entitling an action to be commenced within ninety (90) days of receipt of that notice.

4.

Plaintiff timely files this action within ninety (90) days of receipt of the Notice of Right to Sue from the EEOC.

## III.    <u>JURISDICTION AND VENUE</u>

5.

Plaintiff invokes the jurisdiction of this court pursuant to 28 U.S.C. §§ 1331 and 1343.

6.

Defendants are qualified to do business in this district.  In addition, the acts and omissions that give rise to Plaintiff's claims occurred in this district. Accordingly, venue in this Court is proper pursuant to 29 U.S.C. §1391.

## IV.  PARTIES

7.

Plaintiff is a female citizen of the United States of America and is subject to the jurisdiction of this Court.

8.

At all times relevant Defendants were qualified and licensed to do business in Georgia, and at all times material hereto have conducted business within this District.

9.

Defendant Newrest ATL, LLC ("Defendant") is now and, at all times relevant hereto, has been a domestic limited liability company.   During all times relevant hereto, Defendant has employed fifteen (15) or more employees for the requisite duration under Title VII.   Defendant is therefore covered under Title VII in accordance with 42 U.S.C. § 2000e(b).

10.

Defendant may be served with process by delivering a copy of the summons and complaint to its corporate Registered Agent, CT Corporation System, located at 289 S. Culver Street, Lawrenceville, GA 30046.

## V.    FACTUAL ALLEGATIONS

11.

Plaintiff began working for Defendant on or about August 7, 2023, as an Assistant Driver.

12.

On or about August 7, 2023, Plaintiff began new hire orientation with Defendant.

13.

Plaintiff was the only female in the training class after the first day.

14.

Beginning on the first day of training, Jasmine (Last Name Unknown) a/k/a "Nia," Training Instructor, made multiple sexually explicit comments directly to Plaintiff and to the class, including numerous men, during class time.

4

15.

Men in the classroom also engaged in similar sexually charged commentary and behavior, often in response to Jasmine initiating such conversations.

16.

On or about August 7, 2023, Jasmine said that day that men should not wear sweatpants at Defendant because the "print" of their penis would show and sometimes women couldn't control themselves when they witnessed that.

17.

Jasmine conversely stated that women should not wear leggings because men could not control themselves when that occurred.

18.

On or about August 8, 2023, while for some reason talking about romantic relationships, in front of the class, Jasmine told Plaintiff that she wore her hair in a bun two days in a row, that "her man" would get tired of her, and that she needed to "switch it up" to keep her man.

19.

That day, Jasmine also voiced her opinion that skinny men romantically pursue women with big butts, but then get cheated on by those women and go to "a fat bitch."

20.

On or about August 9, 2023, when Jasmine walked out of the classroom with another woman, four men in the classroom talked about running a "train" on that woman, meaning that they would all have sex with her sequentially.

21.

Earlier, when that female had walked into the classroom, the men in the classroom stared at her.

22.

When Jasmine re-entered the classroom, some of the men expressed their opinion that she was attractive, by, for example, saying "Damn, who was that??"

23.

Jasmine then told the class that Defendant had paid for that female employee to get her "teeth and dimples" done and for her to get a Brazilian Butt Lift, a surgical procedure to increase the size of one's buttocks.

24.

That same day, Jasmine also told the class that her favorite fruit was watermelon.

25.

In response, a male employee said he did not want to talk about watermelons because it "reminded him of something" with clear sexual insinuation.

26.

Soon after, Jasmine brought back up watermelons to that male employee and had a conversation with him where the man talked about how he ate watermelon on a "live streaming" service and that it reminded women who were watching him of him performing oral sex on women.

27.

Jasmine then joked and asked if the male worker also ate hot dogs on the live stream, which elicited exclamations and jokes from the other men in the class.

28.

Jasmine also stated that the employee did softcore pornography.

29.

On or about August 10, 2023, one of the men in the classroom talked about how he would soon have to talk to his daughter about dating men.

30.

On or about August 10, 2023, Jasmine shared a story with the class about her 16-year-old son losing his virginity and how her son had a pregnancy scare after he

had taken a  girl into the woods and had sex with her. Specifically, Jasmine said that her son called her and said he thought he got the girl pregnant. Jasmine also shared how she asked her son if his "cum was clear or yellow," if he urinated inside the girl, and said that she guessed her son had never "came" before and didn't know what "precum" was, or know what to expect.

31.

That same day, Jasmine asked the men in the class if they liked women that got their feet done.

32.

The men in the class responded that they did like women that got their feet done.

33.

Jasmine then asked Plaintiff if she got her feet done.

34.

Jasmine then told the class that she had an OnlyFans page where she sold pictures of her feet online as a side job, pulled up a picture of her foot on her phone, handed it to a male employee, and had her phone passed around.[1]

---

[1] OnlyFans is an online platform primarily used for the purpose of selling pornographic images and videos of oneself online to online followers.

35.

Plaintiff put her head down so no one would pass her the phone.

36.

Jasmine then asked Plaintiff to approach her and sit with her, and once again asked Plaintiff if she got her toes done, to which Plaintiff said yes and that actually, a picture of her foot had gone viral on Instagram.

37.

Plaintiff runs an Instagram page where she sells different apparel items. The picture in question was a picture of Plaintiff's feet with an anklet on her ankle.

38.

Jasmine then went to the photos on her phone and showed Plaintiff a picture of her (Jasmine's) foot and thigh in black fishnets.

39.

Jasmine told Plaintiff, in a flirtatious tone, that she could make a lot of money "selling her feet online".

40.

Because of everything that had occurred that week and because of this conversation in particular, Plaintiff believed Jasmine was coming onto her.

41.

On or about August 11, 2023, Plaintiff complained to Aaron (LNU), Supervisor, that all that had been talked about the entire week during the class was sex and asked to talk to Aaron about it in private.

42.

Aaron then brought Plaintiff to an office.

43.

Then, Aaron pulled Jasmine from the classroom and had an approximately three minute one-on-one conversation with her.

44.

Aaron then returned to the office to speak with Plaintiff.

45.

The first thing Aaron asked Plaintiff was whether she wanted to stay with Defendant, saying that she (Aaron) would take Plaintiff's statement either way, but if Plaintiff no longer wished to be employed by Defendant, Aaron would take Plaintiff's badge before taking her statement.

46.

This made it clear to Plaintiff that having her badge taken away meant that her employment with Defendant had ended.

47.

Plaintiff had also been told by Rafael Stanford, another employee with Defendant, that having your badge taken away means termination before Plaintiff had even applied to Defendant.

48.

Throughout the conversation, rather than listen to Plaintiff's complaints, Aaron attempted to find issues with Plainitff.

49.

For example, Aaron suddenly brought up the bonnett Plaintiff was wearing in an attempt to make it seem like she was not following Defendant's dress code.

50.

Aaron also constantly brought up the fact that Plaintiff would have to go "get her fingerpringting done" that day or she could not continue to be employed by Defendant, specifically telling Plaintiff that if she did not go and get her fingeprints that day, that she (Aaron) would be taking her "badge and her statement," meaning that she would be terminated.

51.

Defendant had rescheduled other employees fingerprinting apointments.

52.

Although at first, Plaintiff told Aaron multiple times that she was distraught and wanted to go home intead of being fingerprinted, when Aaron made it clear to Plaintiff that she had to go get her fingerprinting done or be terminated, Plantiff began to explain the situation in an attempt to ask how she could get her fingerprinting done that day.

53.

At this point, Aaron interrupted Plaintiff and accused her of raising her voice, and when Plaintiff told Aaron she was just trying to tell her about the situation, Aaron responded "you can give me your badge now," terminating Plaintiff.

54.

Aaron also told Plaintiff she would be receiving a call from Human Resources that day.

55.

Plaintiff did not receive a call and so on or about August 16, 2023, she reached out to multiple Human Resources employees via a group text and reported that she had made a complaint to Aaron and that her badge had been taken away as a result.

56.

Then HR Manager, Latoya Strothers, responded and asked Plaintiff to call her. Plaintiff did, and on the call repeated much of what had occurred in the classroom to Strothers, additionally recounting what had happened with Aaron.

57.

Strothers told Plaintiff she would follow up with her after investigating.

58.

Then, on or about August 23, 2023, Strothers sent Plaintiff a text message stating that her "termination," referring to her termination by Aaron on August 11, 2023, would "stand" for "violation of policy – Unprofessional Behavior."

59.

Although Defendant purports to provide a legitimate non-discriminatory reason for the adverse action, this reason is a pre-text for unlawful retaliation in response to Plaintiff's protected activity.

59.

As a result of the termination, Plaintiff has suffered damages, including lost wages and emotional distress.

## VI.   CLAIMS FOR RELIEF

### COUNT ONE:  RETALIATION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964

60.

Plaintiff re-alleges paragraphs 11-59 as if set forth fully herein.

61.

Defendant's terminated Plaintiff in retaliation for her engaging in protected activity, as detailed above, in violation of Title VII.  Plaintiff complained about sexually charged conduct and harassment, which she reasonably believed to be unlawful.

62.

Defendant willfully and wantonly disregarded Plaintiff's rights, and Defendant's retaliation against Plaintiff was untertaken in bad faith. Plaintiff is therefore entitled to punitive damages.

63.

As a result of Defendant's unlawful retaliation, Plaintiff is entitled to damages, including lost wages, damages for emotional distress, punitive damages attorneys' fees, and costs.

## VII.   PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Court:

14

(a)     Grant Plaintiff damages for lost wages and benefits and prejudgment interest thereon;

(b)     Grant general damages for mental and emotional suffering caused by Defendant's misconduct;

(c)     Grant Punitive damages based on Defendant's willful, malicious, intentional, and deliberate acts;

(d)     Grant reasonable attorney's fees and expenses of litigation;

(e)     Grant trial by jury as to all issues;

(f)     Grant prejudgment interest at the rate allowed by law;

(g)     Grant injunctive relief of reinstatement, or front pay in lieu thereof,

(h)     Grant all other relief to which Plaintiff may be entitled.

Respectfully submitted this 15th of April, 2024.

**BARRETT & FARAHANY**

/s/ V. Severin Roberts
V. Severin Roberts
Georgia Bar No. 940504

/s/ Douglas R. McMillan
Douglas R. McMillan
Georgia Bar. 621646

3344 Peachtree Rd NE, Suite 800
Atlanta, Georgia 30326
(404) 214-0120
(404) 214-0125 Facsimile
vsroberts@justiceatwork.com
dmcmillan@justiceatwork.com